# EXHIBIT A
## (Pipette TSA)

**TRANSITION SERVICES AGREEMENT**


**between**

**AMYRIS, INC.**
**and**


**WINDSONG GLOBAL, LLC**

**dated as of**

**January 9, 2024**

# TABLE OF CONTENTS

**ARTICLE I** SERVICES .................................................................................................................1

Section 1.01 Provision of Services. ...............................................................................................1

Section 1.02 Standard of Service. ..................................................................................................2

Section 1.03 Third-Party Service Providers. .................................................................................2

Section 1.04 Access to Premises. ...................................................................................................3

**ARTICLE II** COMPENSATION .................................................................................................3

Section 2.01 Responsibility for Wages and Fees. ..........................................................................3

Section 2.02 Terms of Payment and Related Matters. ...................................................................3

Section 2.03 Extension of Services. ...............................................................................................4

Section 2.04 Terminated Services. .................................................................................................4

Section 2.05 Invoice Disputes. ......................................................................................................4

Section 2.06 No Right of Setoff. ....................................................................................................4

Section 2.07 Taxes. ........................................................................................................................5

**ARTICLE III** TERMINATION ...................................................................................................5

Section 3.01 Termination of Agreement. .......................................................................................5

Section 3.02 Breach. .......................................................................................................................5

Section 3.04 Effect of Termination. ...............................................................................................5

Section 3.05 Force Majeure. ..........................................................................................................5

**ARTICLE IV** CONFIDENTIALITY ..........................................................................................6

Section 4.01          Confidentiality. ..................................................................................................6

**ARTICLE V** LIMITATION ON LIABILITY ............................................................................7

Section 5.01 Limitation on Liability. .............................................................................................7

**ARTICLE VI** MISCELLANEOUS..............................................................................................7

Section 6.01 Notices. ......................................................................................................................7

Section 6.02 Headings. ...................................................................................................................8

Section 6.03 Severability. ...............................................................................................................8

Section 6.04 Entire Agreement. ......................................................................................................8

Section 6.05 Successors and Assigns. ................................................................................................8

Section 6.06 No Third-Party Beneficiaries.........................................................................................9

Section 6.07 Amendment and Modification; Waiver. .........................................................................9

Section 6.08 Governing Law; Submission to Jurisdiction...................................................................9

Section 6.09 Waiver of Jury Trial.......................................................................................................9

Section 6.10 Counterparts...................................................................................................................9

**TRANSITION SERVICES AGREEMENT**

This Transition Services Agreement, dated as of January 9, 2024 (this "**Agreement**"), is entered into between Amyris, Inc., a Delaware corporation ("**Seller**"), and Windsong Global, LLC ("**Buyer**").

**RECITALS**

WHEREAS, Buyer, Seller and certain of Seller's subsidiaries have entered into that certain Asset Purchase Agreement, dated as of December 1, 2023 (the "**Purchase Agreement**"), pursuant to which Seller and such subsidiaries have agreed to sell to Buyer, and Buyer has agreed to purchase from Seller and such subsidiaries, substantially all the assets, and certain specified liabilities, associated with the brand "Pipette" (the "**Brand**"), all as more fully described therein;

WHEREAS, in order to ensure an orderly transition of the Brand to Buyer and as a condition to consummating the transactions contemplated by the Purchase Agreement, Buyer and Seller have agreed to enter into this Agreement, pursuant to which Seller will provide, or cause its Affiliates to provide, Buyer with certain services, in each case on a transitional basis and subject to the terms and conditions set forth herein; and

WHEREAS, capitalized terms used herein and not otherwise defined shall have the meaning ascribed to such terms in the Purchase Agreement.

NOW, THEREFORE, in consideration of the mutual agreements and covenants hereinafter set forth, Buyer and Seller hereby agree as follows:

**ARTICLE I**
**SERVICES**

**Section 1.01   Provision of Services.**

(a)     Seller agrees to provide, or to cause its Affiliates to provide, the services (the "**Services**") set forth on the exhibits attached hereto (as such exhibits may be amended or supplemented pursuant to the terms of this Agreement, collectively, the "**Service Exhibits**") to Buyer for the respective periods and on the other terms and conditions set forth in this Agreement and in the respective Service Exhibits.

(b)     Notwithstanding the contents of the Service Exhibits, Seller agrees to respond in good faith to any reasonable request by Buyer for access to any additional services that are necessary for the operation of the Brand and which are not currently contemplated in the Service Exhibits, to the extent Seller and its Affiliates have the resources readily available to provide such services, at a price to be agreed upon after good faith negotiations between the parties. Any such additional services so provided by Seller shall constitute Services under this Agreement and

be subject in all respect to the provisions of this Agreement as if fully set forth on a Service Exhibit as of the date hereof.

(c)     The parties hereto acknowledge the transitional nature of the Services. Accordingly, as promptly as practicable following the execution of this Agreement, Buyer shall use commercially reasonable efforts, including assigning sufficient resources and qualified personnel, to make a transition of each Service to its own internal organization by the End Date, or to obtain alternate third-party sources to provide the Services.

(d)     Subject to **Section 2.03**, **Section 2.04** and **Section 3.04**, the obligations of Seller under this Agreement to provide Services shall terminate with respect to each Service on the end date specified in the applicable Service Exhibit, which shall in no event be later than the earlier of (i) 30 days following the Closing Date and (ii) the effective date of the Sellers' and their Affiliates' Chapter 11 plan of reorganization (the "**End Date**"). Notwithstanding the foregoing, the parties acknowledge and agree that Buyer may determine from time to time that it does not require all the Services set out on one or more of the Service Exhibits or that it does not require such Services for the entire period up to the applicable End Date. Accordingly, Buyer may terminate any Service, in whole and not in part, upon notification to Seller in writing of any such determination, subject to the payment by Buyer to Seller of Seller's costs and expenses (if any) resulting from such early termination, including, without limitation, any costs or expenses incurred or to be incurred by Seller in anticipation of providing such Services through the applicable End Date.

### Section 1.02   Standard of Service.

(a)     Seller represents, warrants and agrees that the Services shall be provided in good faith, in accordance with Law and, except as specifically provided in the Service Exhibits, in a manner generally consistent with the historical provision of the Services prior to the date hereof (giving due regard to the pendency of the Bankruptcy Case), and with the same standard of care as historically provided. Subject to **Section 1.03**, Seller agrees to assign sufficient resources and qualified personnel as are reasonably required to perform the Services in accordance with the standards set forth in the preceding sentence.

(b)     Except as expressly set forth in **Section 1.02(a)** or in any contract entered into hereunder, Seller makes no representations and warranties of any kind, implied or expressed, with respect to the Services, including, without limitation, no warranties of merchantability or fitness for a particular purpose, which are specifically disclaimed. Buyer acknowledges and agrees that this Agreement does not create a fiduciary relationship, partnership, joint venture or relationships of trust or agency between the parties and that all Services are provided by Seller as an independent contractor.

### Section 1.03   Third-Party Service Providers. It is understood and agreed that to the extent Seller has been retaining third-party service providers with respect to the Services to be provided to by Buyer, it may continue to retain such service providers to provide the Services

under this Agreement. In addition, Seller shall have the right to hire other third-party subcontractors to provide all or part of any Service hereunder.

**Section 1.04    Access to Premises.**

(a)       In order to enable the provision of the Services by Seller, Buyer agrees that it shall provide to Seller's and its Affiliates' employees and any third-party service providers or subcontractors who provide Services, at no cost to Seller, access to its facilities, personnel, assets and books and records, in all cases to the extent necessary for Seller to fulfil its obligations under this Agreement.

(b)       Seller agrees that all of its and its Affiliates' employees and any third-party service providers and subcontractors, when on the property of Buyer or when given access to any equipment, computer, software, network or files owned or controlled by Buyer, shall conform to the policies and procedures of Buyer concerning health, safety and security which are made known to Seller in advance in writing.

## ARTICLE II
### COMPENSATION

**Section 2.01    Responsibility for Wages and Fees.** For such time as any employees of Seller or any of its Affiliates are providing the Services to Buyer under this Agreement, (a) such employees will remain employees of Seller or such Affiliate, as applicable, and shall not be deemed to be employees of Buyer for any purpose, and (b) Seller or such Affiliate, as applicable, shall be solely responsible for the payment and provision of all wages, bonuses and commissions, employee benefits, including severance and worker's compensation, and the withholding and payment of applicable Taxes relating to such employment.

**Section 2.02    Terms of Payment and Related Matters.**

(a)       As consideration for provision of the Services, Buyer shall pay Seller the amount specified for each Service on such Service's respective Service Exhibit. In addition to such amount, in the event that Seller or any of its Affiliates incurs reasonable and documented out-of-pocket expenses in the provision of any Service, including, without limitation, license fees and payments to third-party service providers or subcontractors, but excluding payments made to employees of Seller or any of its Affiliates pursuant to **Section 2.01** (such included expenses, collectively, "**Out-of-Pocket Costs**"), Buyer shall reimburse Seller for all such Out-of-Pocket Costs in accordance with the invoicing procedures set forth in **Section 2.02(b)**.

(b)       As more fully provided in the Service Exhibits and subject to the terms and conditions therein:

(i)       Seller shall provide Buyer, in accordance with **Section 6.01** of this Agreement, with bi-weekly invoices ("**Invoices**"), which shall set forth in reasonable detail, with

such supporting documentation as Buyer may reasonably request with respect to Out-of-Pocket Costs, amounts payable under this Agreement; and

(ii) payments pursuant to this Agreement shall be made within five (5) business days after the date of receipt of an Invoice by Buyer from Seller.

(c) It is the intent of the parties that the compensation set forth in the respective Service Exhibits reasonably approximate the cost of providing the Services, including the cost of employee wages and compensation, without any intent to cause Seller to receive profit or incur loss. If at any time Seller believes that the payments contemplated by a specific Service Exhibit are materially insufficient to compensate it for the cost of providing the Services it is obligated to provide hereunder, or Buyer believes that the payments contemplated by a specific Service Exhibit materially overcompensate Seller for such Services, such party shall notify the other party as soon as possible, and the parties hereto will commence good faith negotiations toward an agreement in writing as to the appropriate course of action with respect to pricing of such Services for future periods.

**Section 2.03   Extension of Services.** The parties agree that Seller shall not be obligated to perform any Service after the applicable End Date; *provided*, *however*, that if Buyer desires and Seller agrees to continue to perform any of the Services after the applicable End Date, the parties shall negotiate in good faith to determine an amount that compensates Seller for all of its costs for such performance, including the time of its employees and its Out-of-Pocket Costs. The Services so performed by Seller after the applicable End Date shall continue to constitute Services under this Agreement and be subject in all respects to the provisions of this Agreement for the duration of the agreed-upon extension period.

**Section 2.04   Terminated Services.** Upon termination or expiration of any or all Services pursuant to this Agreement, or upon the termination of this Agreement in its entirety, Seller shall have no further obligation to provide the applicable terminated Services and Buyer will have no obligation to pay any future compensation or Out-of-Pocket Costs relating to such Services (other than for or in respect of Services already provided in accordance with the terms of this Agreement and received by Buyer prior to such termination or as otherwise provided under Section 1.01(d)).

**Section 2.05   Invoice Disputes.** In the event of an Invoice dispute, Buyer shall deliver a written statement to Seller no later than three (3) days prior to the date payment is due on the disputed Invoice listing all disputed items and providing a reasonably detailed description of each disputed item. Amounts not so disputed shall be deemed accepted and shall be paid, notwithstanding disputes on other items, within the period set forth in **Section 2.02(b)**. The parties shall seek to resolve all such disputes expeditiously and in good faith.

**Section 2.06   No Right of Setoff.** Each of the parties hereby acknowledges that it shall have no right under this Agreement to offset any amounts owed (or to become due and owing) to

the other party, whether under this Agreement, the Purchase Agreement or otherwise, against any other amount owed (or to become due and owing) to it by the other party.

**Section 2.07   Taxes.** Buyer shall be responsible for all sales or use Taxes imposed or assessed as a result of the provision of Services by Seller.

**ARTICLE III**
**TERMINATION**

**Section 3.01   Termination of Agreement.** Subject to **Section 3.03**, this Agreement shall terminate in its entirety (i) on the date upon which Seller shall have no continuing obligation to perform any Services as a result of each of their expiration or termination in accordance with **Section 1.01(d)** or **Section 3.02** or (ii) in accordance with **Error! Reference source not found.**.

**Section 3.02   Breach.** Any party (the "**Non-Breaching Party**") may terminate this Agreement with respect to any Service, in whole but not in part, at any time upon prior written notice to the other party (the "**Breaching Party**") if the Breaching Party has failed (other than pursuant to **Section 3.04**) to perform any of its material obligations under this Agreement relating to such Service, and such failure shall have continued without cure for a period of fifteen (15) days after receipt by the Breaching Party of a written notice of such failure from the Non-Breaching party seeking to terminate such service; provided, however, that in the event of the non-payment by Buyer of any amount due hereunder when due, Seller shall be entitled to terminate this Agreement upon written notice to Buyer if such payment is not made within two business days following demand therefor.

**Section 3.03   Effect of Termination.** Upon termination of this Agreement in its entirety pursuant to **Section 3.01**, all obligations of the parties hereto shall terminate, except for the provisions of **Section 2.04**, **Section 2.06**, **Section 2.07**, **Article IV**, **Article V** and **Article VI**, which shall survive any termination or expiration of this Agreement.

**Section 3.04   Force Majeure.** The obligations of Seller under this Agreement with respect to any Service shall be suspended during the period and to the extent that Seller is prevented or hindered from providing such Service, or Buyer is prevented or hindered from receiving such Service, due to any of the following causes beyond such party's reasonable control (such causes, "**Force Majeure Events**"): (i) acts of God, (ii) flood, fire or explosion, (iii) war, invasion, riot or other civil unrest, (iv) Governmental Order or Law, (v) actions, embargoes or blockades in effect on or after the date of this Agreement, (vi) action by any Governmental Authority, (vii) national or regional emergency, (viii) strikes, labor stoppages or slowdowns or other industrial disturbances, (ix) shortage of adequate power or transportation facilities, or (x) any other event which is beyond the reasonable control of such party. The party suffering a Force Majeure Event shall give notice of suspension as soon as reasonably practicable to the other party stating the date and extent of such suspension and the cause thereof, and Seller shall resume the performance of its obligations as soon as reasonably practicable after the removal of

the cause. Neither Buyer nor Seller shall be liable for the nonperformance or delay in performance of its respective obligations under this Agreement when such failure is due to a Force Majeure Event. The applicable End Date for any Service so suspended shall be automatically extended for a period of time equal to the time lost by reason of the suspension.

### ARTICLE IV
### CONFIDENTIALITY

**Section 4.01    Confidentiality.**

(a)    During the term of this Agreement and thereafter, the parties hereto shall, and shall instruct their respective Representatives to, maintain in confidence and not disclose the other party's financial, technical, sales, marketing, development, personnel, and other information, records, or data, including, without limitation, customer lists, supplier lists, trade secrets, designs, product formulations, product specifications or any other proprietary or confidential information, however recorded or preserved, whether written or oral (any such information, "**Confidential Information**"). Each party hereto shall use the same degree of care, but no less than reasonable care, to protect the other party's Confidential Information as it uses to protect its own Confidential Information of like nature. Unless otherwise authorized in any other agreement between the parties, any party receiving any Confidential Information of the other party (the "**Receiving Party**") may use Confidential Information only for the purposes of fulfilling its obligations under this Agreement (the "**Permitted Purpose**"). Any Receiving Party may disclose such Confidential Information only to its Representatives who have a need to know such information for the Permitted Purpose and who have been advised of the terms of this **Section 4.01** and the Receiving Party shall be liable for any breach of these confidentiality provisions by such Persons; *provided*, *however*, that any Receiving Party may disclose such Confidential Information to the extent such Confidential Information is required to be disclosed by a Governmental Order, in which case the Receiving Party shall promptly notify, to the extent possible, the disclosing party (the "**Disclosing Party**"), and take reasonable steps to assist in contesting such Governmental Order or in protecting the Disclosing Party's rights prior to disclosure, and in which case the Receiving Party shall only disclose such Confidential Information that it is advised by its counsel in writing that it is legally bound to disclose under such Governmental Order.

(b)    Notwithstanding the foregoing, "Confidential Information" shall not include any information that the Receiving Party can demonstrate: (i) was publicly known at the time of disclosure to it, or has become publicly known through no act of the Receiving Party or its Representatives in breach of this **Section 4.01**; (ii) was rightfully received from a third party without a duty of confidentiality; or (iii) was developed by it independently without any reliance on the Confidential Information.

(c)    Upon demand by the Disclosing Party at any time, or upon expiration or termination of this Agreement with respect to any Service, the Receiving Party agrees promptly to return or destroy, at the Disclosing Party's option, all Confidential Information. If such

Confidential Information is destroyed, an authorized officer of the Receiving Party shall certify to such destruction in writing.

## ARTICLE V
### LIMITATION ON LIABILITY

**Section 5.01   Limitation on Liability.** In no event shall Seller have any liability under any provision of this Agreement for any punitive, incidental, consequential, special or indirect damages of any kind, including loss of future revenue or income, loss of business reputation or opportunity relating to the breach or alleged breach of this Agreement, or diminution of value or any damages based on any type of multiple, whether based on statute, contract, tort or otherwise, and whether or not arising from the other party's sole, joint, or concurrent negligence, strict liability, criminal liability or other fault.  In no event shall Seller's aggregate cumulative liability for any claims arising out of or related to this Agreement exceed the amounts paid to Seller under this Agreement.  Buyer acknowledges that the Services to be provided to it hereunder are subject to, and that its remedies under this Agreement are limited by, the applicable provisions of **Section 1.02**, including the limitations on representations and warranties with respect to the Services.

## ARTICLE VI
### MISCELLANEOUS

**Section 6.01   Notices.** All Invoices, notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this **Section 6.01**):

(a)      if to Seller:

> Amyris Clean Beauty, Inc.
> 5885 Hollis St Suite 100
> Emeryville, CA 94608
> Attn: General Counsel
> Email: generalcounsel@amyris.com

with a copy (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
One Sansome Street, Suite 3430
San Francisco, CA  94104
Attn: Debra I. Grassgreen, Jason Rosell and Steven Golden
E-mail: dgrassgreen@pszjlaw.com; jrosell@pszjlaw.com; and
       sgolden@pszjlaw.com

    (b)     if to Buyer:

HRB BRANDS, LLC
15 Riverside Avenue
Westport, CT 06880
Attn: William Sweedler
Email: bsweedler@windsongglobal.com

**Section 6.02   Headings.** The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**Section 6.03   Severability.** If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

**Section 6.04   Entire Agreement.** This Agreement, including all Service Exhibits, constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and supersedes all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event and to the extent that there is a conflict between the provisions of this Agreement and the provisions of the Purchase Agreement as it relates to the Services hereunder, the provisions of this Agreement shall control.

**Section 6.05   Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Subject to the following sentence, neither party may assign its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed. Notwithstanding the foregoing sentence, Buyer may, without the prior written consent of Seller, assign all or any portion of its right to receive Services to any of its Affiliates that participate in the operation of the Brand; *provided*, that such Affiliate shall receive such Services from Seller in the same place and manner as described in the respective Service

Exhibit as Buyer would have received such Service. No assignment shall relieve the assigning party of any of its obligations hereunder.

**Section 6.06   No Third-Party Beneficiaries.** This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever, under or by reason of this Agreement.

**Section 6.07   Amendment and Modification; Waiver.** This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

**Section 6.08   Governing Law; Submission to Jurisdiction.** This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of Laws of any jurisdiction other than those of the State of Delaware. Any legal suit, action or proceeding arising out of or based upon this agreement or the transactions contemplated hereby must be instituted in the Bankruptcy Court, and each party irrevocably submits to the exclusive jurisdiction of such court in any such suit, action or proceeding. Service of process, summons, notice or other document by mail to such party's address set forth herein shall be effective service of process for any suit, action or other proceeding brought in any such court. The parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action or any proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

**Section 6.09   Waiver of Jury Trial.** Each party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this agreement or the transactions contemplated hereby. Each party to this agreement certifies and acknowledges that (a) no representative of any other party has represented, expressly or otherwise, that such other party would not seek to enforce the foregoing waiver in the event of a legal action, (b) such party has considered the implications of this waiver, (c) such party makes this waiver voluntarily, and (d) such party has been induced to enter into this agreement by, among other things, the mutual waivers and certifications in this **Section 6.09**.

**Section 6.10   Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means

of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**Windsong Global, LLC**

By_____
Name:
Title:


**Amyris, Inc.,**
**Chapter 11 Debtor and Debtor in**
**Possession**

By_____
Name: Han Kieftenbeld
Title: Interim Chief Executive Officer
       and Chief Financial Officer

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**Windsong Global, LLC**

By _[signature]_

Name: _Andrew R. Trustee_

Title: _EVP General Counsel_

**Amyris, Inc.,**
**Chapter 11 Debtor and Debtor in**
**Possession**

By _____

Name: Han Kieftenbeld

Title: Interim Chief Executive Officer
         and Chief Financial Officer

**EXHIBIT A**

**[CATEGORY OF SERVICE]**

| | |
|---|---|
| **Description of Service:** | [DESCRIPTION] |
| **End Date:** | [DATE] |
| **Fee:** | [FLAT/HOURLY FEE / DESCRIPTION OF OTHER ARRANGEMENT] |
| **Seller Contact:** | [NAME, CONTACT INFORMATION] |
| **Buyer Contact:** | [NAME, CONTACT INFORMATION] |

**Pipette TSA Service Detail**
*1/7/2024*

| Function | TSA ID | Service / Capability | Description | Duration | Amyris Service Manager | Buyer Service Manager | Estimated Service Cost / Month [1,2,3] |
|---|---|---|---|---|---|---|---|
| | | | | | | $ | 348,780 |
| IT | IT.1 | IT Management and Helpdesk Support | Service Provider will provide oversight of IT enterprise applications and infrastructure for those applications and systems listed under IT.2-6. Additionally the Service Provider will continue to provide helpdesk and support services to the individuals included as part of the TSA under HR.1<br><br>To the extend this service is shared across multiple TSAs, the Service Recipient will be billed an allocated portion based on FTEs leveraging the service. Should other TSAs be exited, the Service Recipient will be responsible for the total cost thereafter. | 1/31/2024 | Misti Gilmore | TBD | 99,322 |
| IT | IT.2 | Enterprise Application | Service Provider to provide access to shared and dedicated application for the employees identified in the TSA under HR.1, housed in the Service Provider's data center, including:<br>- Microsoft Office 365 licenses, administration and management<br>- SharePoint support , licenses, and permissions<br>- SAP concur for travel and expense reporting<br>- Adobe and adobe products licenses and support<br>- Jira (Atlassian) access and support to fulfill customer tickets and support needs | 1/31/2024 | Scott Chinn | TBD | 894 |
| IT | IT.3 | Infrastructure | Service Provider will maintain the following programs, services, applications and infrastructure:<br>- Azure cloud services and support<br>- Amazon Web Services (AWS) for eCommerce, computer and storage support<br>- Sycom hardware support and troubleshooting<br>- SolarWinds server/network monitoring<br>- Cisco (ePlus) network firewall and core switch support, troubleshooting and updating<br>- PivIT support for cisco infrastructure<br>- Eclipse Office Technologies printer support<br>- Beyond Trust for remote support, troubleshooting and configuration<br>- Paxio primary and backup circuits<br>- AT&T primary and backup circuits | 1/31/2024 | Scott Chinn | TBD | 1,287 |
| IT | IT.4 | Security | Service Provider will provide the following security services and systems:<br>- AWS data security risk and posture management<br>- Deepfence, Inc. to protect cloud workloads and resources<br>- Rapid7 security services, vulnerability management, detections, and threat intelligence<br>- Mimecase for web based email attacks and incident response<br>- OneTrust privacy/security for websites<br>- Domo for back-end data security, governance and analytics integration | 1/31/2024 | Scott Chinn | TBD | 252 |
| IT | IT.5 | End User Devices | Service Provider will provide the following end user device support and capabilities:<br>- First Digital for VOIP calling and dialing services<br>- Verizon cell phones and support | 1/31/2024 | Scott Chinn | TBD | 11 |
| IT | IT.6 | Tools Brands | Service Provider will provide access and functionality for the following brand tools:<br>- Figma for collaboration on commercials and ad design and support<br>- Dropbox for media storage and collaboration with outside parties<br>- Wrike project management<br>- Bynder to manage brand digital assets<br>- Cloudflare DNS bot and DDOS protection and support | 1/31/2024 | Scott Chinn | TBD | 49,803 |
| Operations | Ops.1 [4] | Inventory Storage | Service Provider will provide to store inventory at GXO and PFS. The Service Provider will not perform or facilitate any other fulfillment activities with GXO or PFS. Estimated service cost/month is variable. Actual costs will be invoiced to the Service Recipient.<br><br>To the extent a Service Recipient exits the Service Provider's warehouse space, the Service Provider will use best efforts to reduce costs and any savings will be passed to the Service Recipient. To the extent the Service Provider cannot reduce the costs for the remaining period, no savings will apply.<br><br>The Service Recipient will be responsible for all one time costs associated with moving inventory. | 1/31/2024 | Heath Tilley | TBD | 110,000 |
| HR | HR.1 | FTEs | The Service Provider will continue to employee identified FTEs at the request of the Service Recipient through the service period.<br><br>Service cost is representative of a full month's cost. At the time of close the Service Recipient  will be responsible for prepaying the costs of these employees for the time period between close through 1/31/2024 | 1/31/2024 | Christine Ofori | TBD | 87,210 |

[1] Estimated service cost is based on the best available data. Actual service costs may vary and will be billed to Windsong

[2] To the extent Windsong cancels any TSA service, the monthly cost of the TSA service(s) will be incurred and billed to Windsong for a full month if Amyris is unable to exit the cost.

[3] Windsong must provide 14 day notice when exiting FTE related TSAs. Failing to provide adequate notice will result in service costs continuing to be billed until Amyris can terminate employment agreements

[4] The Service Provider is not responsible for and will not coordinate any fulfillment activities with GXO or PFS.